FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 05, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE ESTATE OF DEAN FUNABIKI, by and through its personal representative, RUTH FUNABIKI; RUTH FUNABIKI; ABBY FUNABIKI; and EMILY FUNABIKI, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF WHITMAN; BRETT MYERS; SCOTTY ANDERSON; BRETT KELLER; and MORGAN SCHARFF, <br><br> Defendants. | No. 2:21-CV-00089-MKD <br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT <br><br> **ECF No. 73** |

Before the Court is Defendants' Motion for Summary Judgment, ECF

No. 73. On August 19, 2024, the Court held a hearing on the motion. ECF

No. 126. Jay Krulewitch and Jeffry Finer appeared for Plaintiffs. Carl Warring

and Rachel Stanley appeared for Defendants. The Court has reviewed the briefing

and the record and is fully informed. For the reasons stated below, the Court

grants in part and denies in part Defendants' motion.

ORDER - 1

## UNDISPUTED FACTUAL BACKGROUND

### A. Dr. Funabiki's Detention and Suicide

Decedent Dean Funabiki ("Dr. Funabiki") was a 67-year-old clinical psychologist with his own private practice in Pullman, Washington.  ECF No. 120 at 3 ¶¶ 1-2.  Plaintiff Ruth Funabiki was his wife, and Plaintiffs Abby and Emily Funabiki are his daughters.  *Id.* at 3 ¶¶ 3-4.

In early January 2018, the Pullman Police Department began investigating Dr. Funabiki after one of his patients reported he had sexually assaulted her.  ECF No. 76-13 at 1-2; ECF No. 95-1 at 6.  The Funabikis became aware of the allegations by the second week of January 2018.  ECF No. 120 at 15 ¶ 44.  Ms. Funabiki asked her husband if he had thoughts of self-harm, which he denied.  *Id.* at 15 ¶¶ 45-46.  Prior to the events of early 2018, he had no history of mental illness, no family history of suicide, and no history of drug or alcohol abuse.  *Id.* at 16-17 ¶¶ 50-53.

On February 16, 2018, at 10:29 p.m., Dr. Funabiki turned himself into the Pullman Police Department, and Detective Heidi Lambley formally arrested him for second degree rape.  *Id.* at 4 ¶ 8.  Detective Lambley asked Dr. Funabiki if he was under the influence of drugs or alcohol and if he was thinking about hurting or killing himself.  *Id.* at 4 ¶ 9.  Dr. Funabiki denied both.  *Id.*

1    Dr. Funabiki was taken to the Whitman County Jail ("the Jail").  *Id.* at 4-5

2    ¶ 10.  Officer Brett Keller completed the booking process with Dr. Funabiki,

3    including the Jail's Medical History Booking Form.  ECF No. 77 at 2 ¶¶ 3-5; ECF

4    No. 75-1 at 2.  Dr. Funabiki answered "No" to Question 27 ("Are you under

5    psychiatric care?") and Question 28 ("Do you plan to hurt yourself (are you

6    suicidal)?").  ECF No. 75-1 at 2.  According to Officer Keller, Dr. Funabiki was

7    "fairly cooperative" during this process.  ECF No. 76-1 at 10.

8    Dr. Funabiki was placed in Green Cell 149 in the Green Unit, which is

9    general population.[1]  ECF No. 120 at 5 ¶ 15.  He did not have a roommate.  *Id.*  He

10   was given bedding and jail clothing, including a sweatshirt, and the cell contained

11   a bunk bed.  *Id.*  The light in his cell did not work.  *Id.* at 6 ¶ 15.

12   On February 17 and 18, 2018, Dr. Funabiki exchanged emails with his wife

13   using the Jail's inmate email system, and asked her to bring him clothing,

14   toiletries, and a book; discussed commissary funds; and planned for Ms. Funabiki

15   to visit.  *Id.* at 6-7 ¶¶ 18-19.

16

17   [1] Typically, the Green Unit is used to house male inmates with major uncontrolled

18   medical issues, known behavioral issues, or  are under the influence of drugs or

19   alcohol.  ECF No. 120 at 6 ¶ 16.  In February 2018, the Green Unit was used for

20   general population due to lack of space elsewhere for new arrestees.  *Id.*

ORDER - 3

On February 18, 2018, Ms. Funabiki and Myron Schreck, a friend, visited Dr. Funabiki at the Jail.  *Id.* at 7-8 ¶ 20.  According to Mr. Schreck, Dr. Funabiki's eyes were "puffy, as if he had been crying before" the visit; when Mr. Schreck offered to help in any way he could, he thought Dr. Funabiki "was about to start crying and held it back."  ECF No. 95-5 at 5.  Mr. Schreck also perceived Dr. Funabiki to be "bent over" and that "his shoulders were slightly hunched over," as well as his voice being "lower than normal."  *Id.* at 6-7.  However, Mr. Schreck "did not at the time have the impression that he was at risk for hurting himself."  *Id.* at 7.

At 9:15 p.m., Officer Morgan Scharff distributed medications to Dr. Funabiki, who thanked Officer Scharff.  ECF No. 120 at 8 ¶ 22; ECF No. 95-9 at 3-4; ECF No. 79 at 2 ¶ 6.[2]  At 11:28 p.m., Officer Keller looked into Dr. Funabiki's cell and saw him hanging.  ECF No. 120 at 9 ¶ 28; ECF No. 77 at 3 ¶ 11.  Officer Keller immediately radioed the Control Room Officer, Officer Mikkelsen, for backup.  ECF No. 120 at 9 ¶ 29.  Officer Mikkelsen opened the cell doors from the Control Room and called the paramedics.  *Id.* at 9 ¶ 30.  Officer

---

[2] The parties dispute how long Dr. Funabiki was in his cell without being checked on.  In the Complaint, Plaintiffs assert that Dr. Funabiki was left alone for "an extended period of time, i.e. about seventy four minutes."  ECF No. 35 at 5.

Keller rushed into the cell, called Dr. Funabiki's name, and checked Dr. Funabiki's wrist for a pulse. *Id.* at 10 ¶¶ 31-32. Officer Scharff, who was off the clock but still at the Jail, also came to assist. *Id.* at 11 ¶ 34. Officer Keller removed a sock from Dr. Funabiki's mouth, and Officer Scharff began performing chest compressions until EMTs arrived. *Id.* at 11-12 ¶ 35.

EMTs arrived at the Jail at 11:35 p.m. and placed Dr. Funabiki on a stretcher. *Id.* at 12 ¶ 36, 12-13 ¶ 38. Dr. Funabiki did not respond to chest compressions, and EMTs detected no artifact using an automatic external defibrillator. *Id.* at 13 ¶ 39; ECF No. 76-10 at 12-13. At 11:46 p.m., Dr. Funabiki was taken to the hospital where he was pronounced dead. ECF No. 120 at 13-14 ¶¶ 40-41.

**B. Jail's Policies and Procedures**

At the time of Dr. Funabiki's death, the Jail had a Suicide Prevention policy, Policy No. 2748 (the "Policy"). ECF No. 95-4 at 2-3. The Policy requires the booking officer to "assess the 'suicide potential'" for each inmate and contact the on-call MHP "[w]henever there are indications of a suicide risk." *Id.* at 2. The Policy lists the following three categories of "Suicide Risk Indicators":

> A. Strong indicators:
> 1. Recent attempts, or history of, suicide attempts.
> 2. Suicidal threats and/or a specific plan.
> 3. Writing a suicide note and/or a will; putting personal affairs in order.
> 4. Giving away property.

B. Secondary indicators:
    1. Overly emotional response to incarceration.
    2. Crying or tearful.
    3. Sudden change in behavior.
    4. Experience of loss (loved one, job, material possessions).
    5. Receipt of unexpected legal or personal news.
    6. Feelings of despair, hopelessness, helplessness, depression, exhaustion, agitation, tension, anxiety, guilt, shame, embarrassment, rage, anger, hostility, revenge.
    7. Alcohol and/or drug withdrawal.

C. High-risk groups:
    1. First time juvenile offenders.
    2. First time sexual assault offenders.
    3. Persons experiencing homophobic reactions (excessive fear of homosexuals and/or homosexual feelings.

*Id.* at 2-3.

The Jail's policies were produced by Scotty Anderson, the Facility Commander, and approved by Whitman County Sheriff Brett Myers, who had ultimate responsibility for the Jail. ECF No. 120 at 19-20 ¶ 61; ECF No. 95-17 at 3; ECF No. 95-18 at 3-4.

Commander Anderson was deposed as the Rule 30(b)(6) officer for Whitman County, at which time he did not recall the Jail providing suicide screening training for correctional officers from 2012 to 2017. ECF No. 120 at 31-32 ¶ 78; ECF No. 95-17 at 4-5. Officer Keller also stated that he had not received training while working for the Jail beyond initial academy training when he was

ORDER - 6

hired in 2004 and "leadership and supervisory stuff later on in [his] career."  ECF No. 95-3 at 5-6.  Specifically, Officer Keller testified that he had received no training on suicide assessment and risk evaluation other than what was offered at the academy, before and after Mr. Anderson became Facility Commander.  ECF No. 95-3 at 7-8.  When asked if the Jail had a policy requiring officers to contact a mental health professional to evaluate an inmate for mental health concerns, Officer Keller replied, "As far as a specific policy, I can't remember one.  I know we have." *Id.* at 9.

### C. Dr. Perrien's Report

Plaintiff's expert, Dr. Mary Perrien opines on Dr. Funabiki's suicide risk assessment, and the Jail's policies and practices concerning suicide risk assessment, suicide prevention programs, and related issues.  *See* ECF No. 96.

Dr. Perrien opines that Dr. Funabiki presented a number of risk factors, which "should have resulted in immediate precautions to maintain [his] safety (i.e., suicide watch in suicide-resistant housing under constant observation until properly assessed by a QMHP) and an emergent referral to mental health." *Id.* at 30.  These risk factors include the fact that Dr. Funabiki was an older male pretrial detainee, involved in a high-profile case on a first-time sex offense charge, in his first week of incarceration, and alone in his cell.  *Id.*

ORDER - 7

1    Dr. Perrien also opines on the inadequacies of the Jail's policies.  For

2 example, she states:

3 > The brief Whitman County jail policy on suicide
> prevention was just one-and-one-half pages long and had
4 > not been updated since 2012 (unapproved draft), six years
> prior to Dean Funabiki's detainment and suicide.  In that
5 > time, research continued to reveal significant evidence-
> based correctional suicide risk factors and effective
6 > interventions, though these were not included in the WCJ
> policy.  There was a dearth of relevant, evidence-based
7 > risk factors included on the screen.

8 *Id.* at 14.

9                    **PROCEDURAL HISTORY**

10    Plaintiffs Estate of Dr. Funabiki, Ruth, Abby, and Emily Funabiki filed their

11 initial Complaint on February 17, 2021, ECF No. 1, and the operative Third

12 Amended Complaint on June 20, 2023, ECF No. 35.  They name as Defendants

13 (1) Whitman County ("the County"), which, through the Whitman County

14 Sheriff's Office, operates the Jail; (2) Sheriff Myers; (3) Commander Anderson;

15 (4) Officer Keller; and (5) Officer Scharff.  ECF No. 35 at 2-3 ¶¶ 5-9.

16    The Third Amended Complaint alleges three causes of action: (1) a 42

17 U.S.C. § 1983 claim against Defendants Keller, Scharff, Myers, and Anderson, in

18 their individual capacities, for violating the Fourteenth Amendment, based on

19 deliberate indifference to a serious medical need; (2) a 42 U.S.C. § 1983 claim

20 against Defendants Myers and Anderson in their individual capacities and

ORDER - 8

1 Defendant Whitman County for violating the Fourteenth Amendment through the

2 Jail's suicide prevention and training policies; and (3) a negligence claim against

3 Defendant Whitman County. *See generally* ECF No. 35 at 5-9; *cf.* ECF No. 89 at

4 2. Plaintiffs bring the Section 1983 claims on behalf of Dr. Funabiki's estate and

5 on behalf of the individual Plaintiffs for the deprivation of their Fourteenth

6 Amendment substantive due process right to the companionship and society of Dr.

7 Funabiki, as their spouse or parent.[3] *See* ECF No. 35 at 2 ¶¶ 3-4, 8 ¶ 30.

8

9 _____

[3] In the Third Amended Complaint, the Estate's Section 1983 claims and the

10 individual Plaintiffs' Section 1983 claims are pleaded using the same factual and

11 legal allegations. *See* ECF No. 35 at 2 ¶¶ 3-4, 8 ¶ 30. Plaintiffs have continued to

12 treat the individual Plaintiffs' claims as part and parcel of the Estate's claims—

13 their July 2024 Notice of To-Be-Adjudicated Claims only mentions Section 1983

14 claims for violations of "Dean Funabiki's due process rights." ECF No. 89 at 2. A

15 child or spouse may assert a Fourteenth Amendment claim for the loss of their

16 parent or spouse by demonstrating that a state officer "had time to deliberate before

17 acting or failing to act in a deliberately indifferent manner." *Smith v. Pierce Cnty.*,

18 218 F. Supp. 3d 1220, 1226 (W.D. Wash. 2016) (quoting *Lemire v. Cal. Dep't of*

19 *Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013)) (quotation marks omitted);

20 *see also Scott v. Smith*, 109 F.4th 1215, 1227-28 (9th Cir. 2024); *Napouk v. Las*

**LEGAL STANDARD**

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the portions of the record and the evidence that "demonstrate the absence of a genuine dispute of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting former Fed. R. Civ. P. 56(c)) (quotation marks

---

*Vegas Metro. Police Dep't*, 669 F. Supp. 3d 1031, 1045 (D. Nev. 2023); *Est. of Brown v. Lambert*, 478 F. Supp. 3d 1006, 1022 (S.D. Cal. 2020). Therefore, to the extent the individual Plaintiffs' Fourteenth Amendment claims have not been abandoned, the Court considers them interwoven with the Estate's Fourteenth Amendment deliberate indifference claims.

1  omitted).  After the moving party has satisfied its burden, the nonmoving party

2  must demonstrate "specific facts" showing that there is a genuine dispute of

3  material fact for trial in order to survive summary judgment.  *Id.* at 324.

4      The court "must view the evidence in the light most favorable to the

5  nonmoving party and draw all reasonable inference in the nonmoving party's

6  favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Credibility

7  determinations, the weighing of the evidence, and the drawing of legitimate

8  inferences from the facts are jury functions, not those of a judge . . . ."  *Anderson*,

9  477 U.S. at 255.  However, "[t]he mere existence of a scintilla of evidence in

10  support of the plaintiff's position will be insufficient; there must be evidence on

11  which the jury could reasonably find for the plaintiff."  *Id.* at 252.

12                              **DISCUSSION**

13      Defendants move for summary judgment on the following grounds: (1) no

14  individual Defendant is liable under a Fourteenth Amendment deliberate

15  indifference theory; (2) Defendants Myers and Anderson are not individually

16  liable, as they did not personally participate in Dr. Funabiki's incarceration; (3) the

17  individual Defendants are entitled to qualified immunity; (4) the County is not

18  liable under a Fourteenth Amendment deliberate indifference theory; (5) Plaintiffs

19  lack sufficient evidence of but-for causation to establish their deliberate

20

indifference claims; and (6) Plaintiffs lack sufficient evidence of causation to prove

their state law negligence claim.  *See* ECF No. 73 at 9-20.

**A. 42 U.S.C. § 1983 Claims**

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"[Section] 1983 is not itself a source of substantive rights, but merely provides a

method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*,

490 U.S. 386, 393-94 (1989) (citation and quotation marks omitted).  To state a

claim under Section 1983, a plaintiff must show that she was "deprived of a right

secured by the Constitution or laws of the United States, and that the alleged

deprivation was committed under color of state law."  *Am. Mfrs. Mut. Ins. Co. v.

Sullivan*, 526 U.S. 40, 49-50 (1999).  "An individual acts under color of state law

when he or she exercises power 'possessed by virtue of state law and made

possible only because the wrongdoer is clothed with the authority of state law.'"

*Naffe v. Frey*, 789 F.3d 1030, 1036 (9th Cir. 2015) (quoting *United States v.

Classic*, 313 U.S. 299, 326 (1941)).

ORDER - 12

Here, there is no dispute that all Defendants were acting under color of state law.  Therefore, the Court continues to the substance of Plaintiffs' constitutional claims.

## B. Section 1983 Claims Against Individual Defendants

### 1. Claim 1 - Deliberate Indifference to Medical Needs as to All Four Individual Defendants

Plaintiffs allege that Defendants Scharff, Keller, Anderson, and Myers violated Dr. Funabiki's Fourteenth Amendment rights by acting with deliberate indifference to his safety and life while he was detained at the Jail by failing to administer an adequate mental health assessment, including a proper suicide risk assessment, by placing him in a general population cell alone, and failing to check on his welfare for a period of time.  ECF No. 35 at 5 ¶¶ 20-21, 8 ¶¶ 30-31.

"Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a right to receive medical treatment while in police custody." *Hyde v. City of Willcox*, 23 F.4th 863, 873 (9th Cir. 2022) (citation omitted).  This includes medical personnel screening pretrial detainees for "critical medical needs." *Id.* (quoting *Gordon v. Cnty. of Orange*, 6 F.4th 961, 971 (9th Cir. 2021) ("*Gordon II*")) (quotation marks omitted).  "A heightened suicide risk or an attempted suicide is a serious medical need[]" for the purposes of the Fourteenth Amendment right to medical treatment. *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915

ORDER - 13

(2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011); *see also*

*NeSmith v. Cnty. of San Diego*, No. 15-CV-629, 2019 WL 1326701, at *21 (S.D.

Cal. Mar. 25, 2019) ("The Ninth Circuit has held that a suicide risk or an attempted

suicide is a serious medical need." (citing *Conn*, 591 F.3d at 1095)), *aff'd in part,*

*appeal dismissed in part sub nom. NeSmith v. Olsen*, 808 F. App'x 442 (9th Cir.

2020).

"A claim under this right 'must be evaluated under an objective deliberate

indifference standard.'" *Hyde*, 23 F.4th at 873 (quoting *Gordon v. Cnty. of*

*Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) ("*Gordon I*")). "Under that

standard, pretrial detainees alleging that jail officials failed to provide

constitutionally adequate medical care must show[]" the following elements:

> (1) The defendant made an intentional decision with
> respect to the conditions under which the plaintiff was
> confined [including a decision with respect to medical
> treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of
> suffering serious harm;
>
> (3) The defendant did not take reasonable available
> measures to abate that risk, even though a reasonable
> official in the circumstances would have appreciated the
> high degree of risk involved—making the consequences
> of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the
> plaintiff's injuries.

*Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (quoting

*Gordon I*, 888 F.3d at 1125) (alteration in *Sandoval*).  "To satisfy the third

element, the plaintiff must show that the defendant's actions were 'objectively

unreasonable,' which requires a showing of 'more than negligence but less than

subjective intent—something akin to reckless disregard.'"  *Id.* (quoting *Gordon I*,

888 F.3d at 1125).

Plaintiffs argue that, under the objective deliberate indifference standard,

they "do not need to show actual knowledge on the part of the defendants in this

case."  ECF No. 98 at 5.  However, as the Ninth Circuit has made clear, a failure-

to-protect claim must include some degree of intentional conduct:

> In the failure-to-protect context, in which the issue is
> usually inaction rather than action, the equivalent is that
> the officer's conduct with respect to the plaintiff was
> intentional.  For example, if the claim relates to housing
> two individuals together, the inquiry at this step would be
> whether the placement decision was intentional.  Or, if the
> claim relates to inadequate monitoring of the cell, the
> inquiry would be whether the officer chose the monitoring
> practices rather than, for example, having just suffered an
> accident or sudden illness that rendered him unconscious
> and thus unable to monitor the cell.

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

Defendants seek summary judgment on the ground that that Plaintiffs cannot

demonstrate Defendants acted with the requisite deliberate indifference.  ECF

No. 73 at 9-11.  Specifically, they assert that "Plaintiffs lack sufficient, competent

1    evidence to prove any individual defendant was deliberate[ly] indifferent to a

2    strong likelihood [Dr.] Funabiki would attempt suicide." *Id.* at 10.

3                    a.  Officer Keller

4            Officer Keller conducted Dr. Funabiki's medical screening.  ECF No. 77 at 2

5    ¶¶ 5; ECF No. 75-1 at 2.  Plaintiffs allege that Officer Keller was deliberately

6    indifferent to Dr. Funabiki's Fourteenth Amendment rights as he did not provide

7    Dr. Funabiki with a "proper suicide risk assessment."  ECF No. 35 at 5.

8    Defendants assert that Officer Keller did not violate Dr. Funabiki's constitutional

9    rights and that he is entitled to qualified immunity.  ECF No. 73 at 19.

10           During Dr. Funabiki's medical screening, Officer Keller asked him two

11   questions about self-harm: "Are you under psychiatric care?" and "Do you plan to

12   hurt yourself (are you suicidal)?"  ECF No. 75-1 at 2.  Plaintiffs assert that, in

13   asking only these two questions, Officer Keller "ignored the fact that Dean

14   Funabiki had numerous suicide risk indicators that should have led him to put Mr.

15   Funabiki on acute suicide watch until a qualified mental health provider ('QMHP')

16   could properly assess Mr. Funabiki along with an emergent referral to mental

17   health."  ECF No. 98 at 8.  In sum, Plaintiffs allege that Officer Keller was

18   deliberately indifferent in ignoring the risk factors noted by Dr. Perrien: Dr.

19   Funabiki was (1) in his first week of incarceration, (2) charged with a first-time sex

20   offense, (3) older (67 years old), (4) male, (5) experiencing loss of support, loss of

status, and shame, and (6) involved in a high-profile case.  *Id.* (citing ECF No. 96 at 28-31).

The fact that Officer Keller inquired during the medical screening whether Dr. Funabiki intended to harm himself demonstrates that Officer Keller was not deliberately indifferent to such a risk.  Plaintiffs have not offered evidence from which a reasonable fact finder could conclude that Officer Keller intentionally chose not to ask Dr. Funabiki further screening questions.  *See Castro*, 833 F.3d at 1070.  Further, the Ninth Circuit has held that a defendant must have been aware of an inmate's condition before they can be held liable under a deliberate indifferent theory.  *Hyde*, 23 F.4th at 873 (citing *Sandoval*, 985 F.3d at 680); *see also Sandoval*, 985 F.3d at 669-70 (holding that a jury could find a nurse acted with reckless disregard when, after he was told that an inmate was shaking, tired, disoriented, and in need of further evaluation, the nurse only conducted "a quick blood test," then ignored the inmate for the rest of his six-hour shift).  Here, there is no dispute that Dr. Funabiki had no history of mental health concerns and denied any suicidal ideation to his family, Detective Lambley, and Officer Keller.  ECF No. 120 at 4 ¶ 9, 15 ¶¶ 45-46, 16-17 ¶¶ 49-52; ECF No. 75-1 at 2.  When Officer Keller specifically asked during the booking screening, Dr. Funabiki denied planning to hurt himself.  ECF No. 75-1 at 2; ECF No. 77 at 2 ¶ 5; *see Est. of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 391 (7th Cir. 2024) ("An express

statement that the deceased was not considering suicide[,] from the deceased

himself[,] weighs heavily against objective unreasonableness." (citations, quotation

marks, and alterations omitted)).

Citing *NeSmith*, 2019 WL 1326701, Plaintiffs assert that Officers Keller and

Scharff should have recognized that Dr. Funabiki was depressed even if he had not

asked for help, given that Mr. Schreck had recognized Dr. Funabiki's depression.

ECF No. 98 at 10-11.  Mr. Schreck testified that when he visited the Jail, Dr.

Funabiki's eyes were puffy, as if he had been crying; that when Mr. Schreck

offered to help in any way he could, he thought Dr. Funabiki "was about to start

crying and held it back"; that his shoulders were hunched; and that he spoke in a

low voice.  ECF No. 95-5 at 5-7.  However, Plaintiffs present no evidence that

Officers Keller or Scharff or any other Defendant observed these signs.  Moreover,

Mr. Schreck did not interpret these signs to mean that Dr. Funabiki might hurt

himself.  *See id.* at 7.  Thus, this case differs from *NeSmith,* where there were

material factual disputes about whether the officers had seen a rope in the inmate's

cell and whether the inmate had exhibited signs that he was suicidal.  *See NeSmith*,

2019 WL 1326701, at *22-23.

Last, Plaintiffs assert that Officer Keller also failed to adhere to the suicide

risk indicators in the Jail's Policy on suicide prevention.  ECF No. 98 at 8-9.

Plaintiffs allege that Officer Keller acted with deliberate indifference by not

classifying Dr. Funabiki "as a high risk to commit suicide" under the Policy, as he "fit into many of the strong indicators and secondary indicators and was clearly in a high-risk group, namely first-time sexual assault offenders." *Id.* at 9.  However, as detailed above, Plaintiffs present no evidence that Officer Keller observed any of the Policy's indicators of suicide risk, such as crying, tearfulness, or a sudden change in behavior.  *See* ECF No. 95-4 at 2-3.  Plaintiffs seem to alternatively contend that because Dr. Funabiki fell into the high-risk category of first-time sexual assault offenders, he should have automatically been classified as a high risk to commit suicide, despite not demonstrating any risk indicators.  Plaintiffs have not demonstrated that the intended interpretation of the Policy was that any detainee who was in a high-risk category but demonstrated no risk indicators should have automatically been referred to an on call mental health provider.  Nor have Plaintiffs introduced any evidence that Officer Keller was familiar with the Policy.  *See* ECF No. 95-3 at 7, 9.  Plaintiffs themselves indicate that Officer Keller did not act with deliberate indifference in arguing that "[b]ased on his lack of training, Officer Keller assumed that if an inmate did not express suicidal ideation, then the inmate posed no risk."  ECF No. 98 at 9.

No reasonable jury could conclude from this evidence that Officer Keller was deliberately indifferent to Dr. Funabiki's risk of suicide.

b.  Officer Scharff

Officer Scharff conducted checks on Dr. Funabiki's cell.  ECF No. 79 at 2 ¶¶ 5-6.  Plaintiffs allege that "Officer Scharff was deliberately indifferent for ignoring Dr. Funabiki's serious medical need, of his heightened risk for suicide, and taking no steps to abate his risk of suicide[ and] treated Dean Funabiki as just an average inmate with no paramount or critical needs . . . ."  ECF No. 98 at 9-10. Defendants contend that Officer Scharff did not violate Dr. Funabiki's constitutional rights and that he is entitled to qualified immunity.  ECF No. 73 at 9-10, 19.

As with Officer Keller, Plaintiffs present no evidence that Officer Scharff was aware of any risk of suicide by Dr. Funabiki that rendered his actions objectively unreasonable.  *See Sandoval*, 985 F.3d at 669.  No reasonable jury could conclude from this evidence that Officer Scharff was deliberately indifferent to Dr. Funabiki's risk of suicide.

### c.  Sheriff Myers and Commander Anderson

Defendant Anderson was the Facility Commander and Defendant Myers, as Sheriff, had ultimate responsibility for the Jail.  ECF No. 120 at 20-22 ¶¶ 62-64. Plaintiffs allege that Defendants Myers and Anderson were deliberately indifferent to Dr. Funabiki's Fourteenth Amendment rights by failing to protect him and "keep him safe . . . from suicide or the risk of suicide."  ECF No. 35 at 6.  Defendants assert that Sheriff Myers and Commander Anderson are entitled to summary

judgment because they did not personally participate in Dr. Funabiki's incarceration and that they are entitled to qualified immunity. ECF No. 73 at 12-13, 19.

To the extent that Plaintiffs allege in Claim 1 that Defendants Myers and Anderson themselves were deliberately indifferent to Dr. Funabiki's medical needs, the Court agrees that Plaintiffs have presented no evidence that Defendants Myers and Anderson had any direct involvement in Dr. Funabiki's incarceration or that they were aware of any suicide risk presented by Dr. Funabiki that rendered their actions objectively unreasonable. *See Sandoval*, 985 F.3d at 670; ECF No. 120 at 20-23 ¶¶ 62-65. No reasonable jury could conclude from this record that Sheriff Myers and Commander Anderson Officer Scharff were deliberately indifferent to any risk of suicide by Dr. Funabiki.

### 2. Claim 2 – Deliberate Indifference to Suicide Prevention Policies and Training by Sheriff Myers and Commander Anderson

In Claim 2, Plaintiffs allege that Defendants Myers and Anderson are individually liable as supervisors under the Fourteenth Amendment for failing to enact "proper policies for the evaluation and assessment of the risk of suicide" and to train the Jail's correctional officers on evaluating inmates for the risk of suicide. ECF No. 35 at 5-6 ¶ 22, 7 ¶ 28; *see also* ECF No. 98 at 14.

Supervisors cannot be subject to *respondeat superior* liability on a Section 1983 claim. *Hyde*, 23 F.4th at 874 (citation omitted).

ORDER - 21

But supervisors can be held liable for: 1) *their own culpable action or inaction in the training, supervision, or control of subordinates*; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others.

*Id.* (citations and quotation marks omitted) (emphasis added). "[A] supervisor may be liable under § 1983 for failing to train subordinates where the supervisor 'was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights.'" *Hanna ex rel. Henderson v. Cnty. of Fresno*, No. 14-cv-142, 2014 WL 6685986, at *12 (E.D. Cal. Nov. 26, 2014) (quoting *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014)). "Under this standard, the plaintiff must allege facts to show that the official 'disregarded the known or obvious consequence' that a particular omission in their training program would cause municipal employees to violate citizens' constitutional rights." *Hyde*, 23 F.4th at 874 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)) (alterations omitted). An inadequate training policy cannot be "inferred from a single incident." *Id.* at 874-75 (citations omitted). "Otherwise, a plaintiff could effectively shoehorn any single incident with no other facts into a failure-to-train claim against the supervisors and the municipality." *Id.* at 875.

Plaintiffs allege that the lack of policies and training has "led to suicides [sic] attempts and some completed jail suicides routinely occurring in this small

ORDER - 22

jail over the course of 14 years." ECF No. 98 at 13-14. Plaintiffs provide no evidence (1) that such events occurred prior to Dr. Funabiki's booking in February 2018, or (2) that the Defendants had reason to believe that such incidents were a consequence of the Jail's suicide policies and training yet disregarded this consequence. In their Statement of Disputed Material Facts, Plaintiffs allege that "Whitman County listed 14 suicide attempts and one complete suicide (not including that of Dean Funabiki) which had occurred from 2012 to [the date of Whitman County's response, December 12, 2022] and stated that no post-incident reviews, mortality reviews, or case reviews were conducted after any of them."[4] ECF No. 94 at 44 ¶ 77a. This period ranges from six years before, to nearly five

_____

[4] For this asserted fact, Plaintiffs cite to "Krulewitch Decl, [sic] Exhibit Twenty-One, Defendant's Answers and Responses to Plaintiffs' First Interrogatories and Requests for Production dated December 12, 2022." ECF No. 94 at 44 ¶ 77a. This exhibit contains Whitman County's "Answers and Responses to Plaintiffs' First Interrogatories and Requests for Production dated December 12, 2022." ECF No. 95 at 3 (identifying exhibit contents); ECF No. 95-21. But this exhibit does not include any information about other suicide incidents at the Jail. *See* ECF No. 95-21; LCivR 56(c)(1)(B) ("As to each disputed fact, the statement shall cite to the specific page or paragraph of the record where the disputed fact is found . . . .").

years after, Dr. Funabiki's suicide[5] and does not demonstrate what Defendants

Myers and Anderson knew in February 2018, at the time of Dr. Funabiki's death.

Because Plaintiffs have not shown that other incidents gave Defendants Myers and

Anderson reason to believe that their policies and training were inadequate,

Plaintiffs ask the Court to infer inadequate training from a single incident, which it

cannot do.  *See Hyde*, 23 F.4th at 874-75.

Although Plaintiffs have established genuine issues of fact regarding

whether the Jail's officers received training on suicide risk assessment, *see, e.g.,*

ECF No. 95-3 at 5-8, no reasonable jury could conclude from this record that

Defendants Myers and Anderson disregarded a known or obvious consequence that

an inadequacy in their training program would cause officers to violate pretrial

detainees' constitutional rights.  *See Hyde*, 23 F.4th at 874.  Moreover, given the

---

[5] Dr. Perrien states that Defendants provided information reflecting "14 suicide

attempts and one (1) additional suicide . . . between 2016 and March 2022," not

including Dr. Funabiki's suicide.  ECF No. 96 at 26.  This suggests that these

statistics actually come from a period only two years before, to four years after, Dr.

Funabiki's suicide.  Dr. Perrien cites "WC supplemental responses to

interrogatories" for these figures, ECF No. 96 at 26 n.18, but the Court has not

been able to locate this document in the record.

ORDER - 24

circumstances presented here, where there is no genuine dispute that no officer observed any of the risk indicators set forth in the policy, no reasonable juror could conclude that any failure to train on the County's Policy caused any alleged constitutional violation.

### 3. *Qualified Immunity*

The Court next assesses whether summary judgment is warranted on qualified immunity grounds. "To determine whether an officer is entitled to qualified immunity, the Court asks, in the order it chooses, (1) whether the alleged misconduct violated a constitutional right and (2) whether the right was clearly established at the time of the alleged misconduct." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013)) (alterations and quotation marks omitted). "While the constitutional violation prong concerns the reasonableness of the officer's *mistake of fact*, the clearly established prong concerns the reasonableness of the officer's *mistake of law*." *Gordon II*, 6 F.4th at 968 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011)) (quotation marks omitted) (emphases in original). If the answer to either question is no, then the officer cannot be held liable for damages. *Id.* (citation omitted).

As explained above, there is no question for the jury on the first prong, but the Court nevertheless considers the second prong—whether the right Plaintiffs are

1   asserting was clearly established at the time of Dr. Funabiki's suicide.  Even if

2   Plaintiffs could establish that individual Defendants violated Dr. Funabiki's

3   Fourteenth Amendment right to medical care for a serious medical need, the law

4   was so not so clearly established that these officials would have known their

5   conducted violated the Constitution given Plaintiffs' specific allegations here.

6          "The 'clearly established' standard . . . requires that the legal principle

7   clearly prohibit the officer's conduct in the particular circumstances before him."

8   *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  The rule's contours must

9   be so well defined that it is 'clear to a reasonable officer that his conduct was

10  unlawful in the situation he confronted.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S.

11  194, 202 (2001)).  "[T]he right must be defined with specificity," not at "a high

12  level of generality."  *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019)

13  (citations and quotation marks omitted).  "It is not necessary . . . that the very

14  action in question has previously been held unlawful.  . . . But in the light of pre-

15  existing law, the unlawfulness of the officer's conduct must be apparent."  *Ziglar*

16  *v. Abbasi*, 582 U.S. 120, 151 (2017) (citations and quotation marks omitted).

17  "When this test is properly applied, it protects 'all but the plainly incompetent or

18  those who knowingly violate the law.'"  *Hernandez*, 897 F.3d at 1132-33 (quoting

19  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

20

1    "The plaintiff 'bears the burden of showing that the rights allegedly violated

2    were clearly established[]'" at the time of impermissible conduct.  *Gordon II*, 6

3    F.4th at 969 (quoting *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th

4    Cir. 2017)).  However, when considering this question of law, a court draws on its

5    "'full knowledge' of relevant precedent rather than restricting [its] review to cases

6    identified by the plaintiff." *Id.* (quoting *Elder v. Holloway*, 510 U.S. 510, 516

7    (1994)).

8    Here, Defendants assert "[t]here is no case law to suggest the individual

9    Defendants should have initiated suicide precaution protocols for Funabiki based

10   solely on statistical risk factors." ECF No. 73 at 19.  The Court agrees, having

11   searched for such case law without success.  Nor has Plaintiff identified any Ninth

12   Circuit or Supreme Court precedent supporting its contention.

13   At the time of Dr. Funabiki's detention, the law was clearly established that

14   pretrial detainees had a Fourteenth Amendment right to be free from deliberate

15   indifference from their medical needs, including the serious risk of suicide.  *See*

16   *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1245 (9th Cir. 2010) (finding

17   that pretrial detainees had a clearly established right to mental health care),

18   *overruled on other grounds by Castro*, 833 F.3d 1060; *Christie v. Dep't of Corr.*,

19   No. 22-cv-5692, 2024 WL 3939287, at *7 (W.D. Wash. Aug. 26, 2024) ("With

20   respect to the personally participating defendants and the supervisory defendants,

the Court agrees that in 2019, [the decedent] had a clearly established right to be

free from deliberate indifference to his mental health needs, including his risk of

suicide."); *Wright v. Dunne*, No. 15-cv-2671, 2020 WL 977963, at *8 (E.D. Cal.

Feb. 28, 2020) ("The Court agrees that there exists a clearly established right to be

free from deliberate indifference to serious mental health needs, including risk of

suicide." (citing *Clouthier*, 591 F.3d at 1245)).

However, when construed with the necessary specificity, *see Emmons*, 586

U.S. at 42, the right Plaintiffs articulate in their Complaint is a right to have

received a specific type or a greater amount of suicide prevention protocols based

on statistical factors. *See* ECF No. 35 at 5 ¶ 20 ("Dean Funabiki was not given a

*proper* mental health evaluation, including a *proper* suicide risk assessment"), 5-6

¶ 22 ("Whitman County Jail Officers did not undergo regular training regarding . . .

how to *properly* take precautions for incoming inmates regarding possible

suicide.") (emphases added). Such a right was not clearly established as of

February 2018.

In 2015, the Supreme Court reversed the Third Circuit's finding that

prisoners had an Eighth Amendment "right to the proper implementation of

adequate suicide prevention protocols."[6] *Taylor v. Barkes*, 575 U.S. 822, 824

(2015) (quoting *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 327 (3d Cir. 2014))

(quotation marks omitted).  The Court found that this "purported right" was not

clearly established as of November 2004.  *Id.* at 825.  As it explained:

> No decision of this Court establishes a right to the proper
> implementation of adequate suicide prevention
> protocols.  No decision of this Court even discusses
> suicide screening or prevention protocols.  And "to the
> extent that a 'robust consensus of cases of persuasive
> authority'" in the Courts of Appeals "could itself clearly
> establish the federal right respondent alleges," . . . the
> weight of that authority at the time of [the decedent's]
> death suggested that such a right did *not* exist.

*Id.* at 826 (citations omitted) (emphasis in original).  The Court noted that the

Third Circuit had relied on two prior Third Circuit cases, neither of which had

"clearly established the right at issue."  *Id.*  Rather, these cases had established that

---

[6] The Eighth Amendment applies to the conditions of confinement for prisoners

serving a criminal sentence, whereas the Fourteenth Amendment applies to pretrial

detainees.  *See Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003)

(citations omitted).  Courts sometimes "borrow[] from Eighth Amendment

jurisprudence in giving shape to pretrial detainees' substantive due process rights,"

although the Eighth Amendment and Fourteenth Amendment standards differ.

*Conn*, 591 F.3d at 1095 (citations omitted).

ORDER - 29

officials who actually know of an inmate's particular vulnerability to suicide must

not be recklessly indifferent to that vulnerability. *Id.* at 826-27 (citations omitted).

But these cases "did not identify any minimum screening procedures or prevention

protocols that facilities must use." *Id.* at 827.

Similarly, Ninth Circuit precedent recognizes a clearly established right of

pretrial detainees to be free from deliberate indifference to their serious risk of

suicide but *not* a right to suicide screening or prevention protocols. *See Christie*,

2024 WL 3939287, at *8 ("[T]here is not precedent clearly establishing a broader

right to effective suicide prevention protocols."); *Est. of Touloudjian v. Cal. Dep't*

*of Corr.*, No. 20-cv-520, 2022 WL 20306146, at *9 (C.D. Cal. May 3, 2022)

(finding a prison warden "entitled to qualified immunity with respect to [the

plaintiff's] supervisory claim for failure to implement 'inmate welfare policies,'

train staff members to abide by those policies, and reprimand or terminate staff

members who failed to abide by those policies."); *Germaine-McIver v. Cnty. of*

*Orange*, No. CV 16-1201, 2018 WL 6258896, at *12 (C.D. Cal. Oct. 31, 2018)

(finding the individual defendants entitled to qualified immunity "[s]ince there was

no clearly established right to proper suicide prevention protocols"); *NeSmith*,

2016 WL 4515857, at *7-8 (finding that a sheriff's failure to implement a "better"

suicide policy did not violate clearly established law). Plaintiffs have not

identified a single case holding that a pretrial detainee is entitled to a particular set

of suicide prevention protocols nor entitled to suicide prevention protocols based solely on statistical factors.

In sum, the right the individual Defendants allegedly violated was not clearly established as of February 2018, therefore the individual Defendants are entitled to qualified immunity.

## C. Claims Against Whitman County

Plaintiffs bring a Section 1983 claim based on the Jail's suicide prevention policy and failure to train and a negligence claim against the County.

### 1. Section 1983 Claim

"[T]o hold a government entity defendant liable under § 1983, a plaintiff must show that the government entity violated statutorily or constitutionally protected rights under color of state law. *NeSmith*, 2019 WL 1326701, at *26 (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978)). The government entity is not vicariously liable for its employees' actions, but rather it is only liable for its "*own* illegal acts." *Connick*, 563 U.S. at 60 (citations and quotation marks omitted) (emphasis in original). "Because government entities can only act through individuals, to attribute actions of individuals to the government entity itself without imposing vicarious liability, the individual's actions must be performed 'pursuant to official municipal policy' or according to 'practices so persistent and widespread as to practically have the force of law.'"

1    *NeSmith*, 2019 WL 1326701, at *26 (quoting *Connick*, 563 U.S. at 61; *Long v.*

2    *Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)).

3        There are three ways to establish a "policy" sufficient to hold a local

4    government entity liable under *Monell*. *Gordon II*, 6 F.4th at 973. First, the entity

5    may be liable "when it acts 'pursuant to an expressly adopted official policy.'" *Id.*

6    (quoting *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)).

7    Second, the entity may be liable where a "longstanding practice or custom" causes

8    a constitutional injury, including where the entity "fails to implement procedural

9    safeguards to prevent constitutional violations or, sometimes, when it fails to train

10   its employees adequately." *Id.* (quoting *Thomas*, 763 F.3d at 1170; *Tsao v. Desert*

11   *Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)) (alteration and quotation marks

12   omitted). Third, the entity may be liable "when the individual who committed the

13   constitutional tort was an official with final policy-making authority or [when]

14   such an official ratified a subordinate's unconstitutional decision or action and the

15   basis for it." *Id.* at 974 (citation and quotation marks omitted). There must be a

16   "direct causal link" between the relevant policy and the constitutional injury at

17   issue. *Sandoval*, 985 F.3d at 681 (quoting *Castro*, 833 F.3d at 1075) (quotation

18   marks omitted).

19       Plaintiffs rely on the "longstanding practice or custom" theory, namely the

20   failure to train/failure to act bases. ECF No. 98 at 14 ("Municipal Liability: failure

1    to train"), 15 ("municipal liability based on faulty policies").  Therefore, Plaintiffs

2    must show (1) that a County employee violated Dr. Funabiki's constitutional

3    rights; (2) "that the [C]ounty has customs or policies that amount to deliberate

4    indifference";[7] and (3) "that these customs or policies were the moving force

5    behind the employee's violation of constitutional rights."  *Long*, 442 F.3d at 1186.

6    Defendants contend that the County's policies did not violate a cognizable right,

7    but even if there was such a policy, Plaintiffs have not shown that the County had

8    notice of this sufficient to establish deliberate indifference.

9         Deliberate indifference requires "proof that a municipal acter disregarded a

10   *known or obvious* consequence of his action."  *Connick*, 563 U.S. at 61 (citation

11   and quotation marks omitted).  A plaintiff must show that "policymakers are on

12

13   ───────────────

     [7] Under Ninth Circuit case law, deliberate indifference is not a stand-alone element

14   required in every *Monell* case.  Deliberate indifference is required to establish a

15   policy or custom if the alleged policy or custom is the "decision not to train certain

16   employees about their legal duty to avoid violating citizens' rights," *Connick*, 563

17   U.S. at 61, or, more broadly, whenever "a plaintiff pursues liability based on a

18   failure to act," *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir.

19   2020) (citing *Tsao*, 698 F.3d at 1143).  This case involves a failure to act and thus

20   Plaintiff must demonstrate deliberate indifference by the County.

     ORDER - 33

actual or constructive notice that a particular omission in their training program causes [the government entity's] employees to violate citizens' constitutional rights." *Id.* "A pattern of similar constitutional violations by untrained employees is ordinarily necessary" to show constructive notice. *Connick*, 563 U.S. at 61 (citation and quotation marks omitted); *see also Gordon II*, 6 F.4th at 974 ("[*Monell* l]iability for improper custom may not be predicated on isolated or sporadic incidents[.]" (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quotation marks omitted))).

Here, Plaintiffs have failed to demonstrate how the County had notice that its suicide policies and related officer training was causing County employees to violate citizens' constitutional rights. *See Connick*, 563 U.S. at 61. As noted above, Plaintiffs allege that, between 2012 and 2022, there were 14 suicide attempts and one completed suicide, not including Dr. Funabiki. As also noted above, Plaintiffs have not provided support from the record for this statement nor have they specified which, if any, of those incidents occurred before Dr. Funabiki's booking. This is insufficient to establish a genuine dispute of fact as to whether the County had actual or constructive notice of any deficient policy or training.[8]

---

[8] As Plaintiffs have not established notice, the Court does not reach the issue of causation.

ORDER - 34

1          *2. State-Law Negligence Claim*

2          Finally, Plaintiffs allege that the County is liable for the negligent actions

3    and omissions of Defendants Myers, Anderson, Keller, and Scharff resulting in

4    Dr. Funabiki's death.  ECF No. 35 at 9 ¶ 35.

5          "A showing of negligence requires proof of the following elements:

6    (1) existence of a legal duty, (2) breach of that duty, (3) an injury resulting from

7    the breach, and (4) proximate cause." *Christensen v. Royal Sch. Dist. No. 160*, 124

8    P.3d 283, 285 (Wash. 2005) (citations omitted).  Proximate cause consists of both

9    cause in fact (also referred to as but-for causation) and legal causation.  *See*

10   *Wuthrich v. King Cnty.,* 366 P.3d 926, 930 (Wash. 2016) (citations omitted).

11   "Cause in fact is usually a question for the jury; it may be determined as a matter

12   of law only when reasonable minds cannot differ." *Joyce v. State*, 119 P.3d 825,

13   833 (Wash. 2005) (citation omitted); *see also Wuthrich,* 366 P.3d at 930 (quoting

14   *Hartley v. State,* 698 P.2d 77, 83 (Wash. 1985)).

15         Defendants move for summary judgment on the negligence claim,

16   contending that Plaintiffs cannot prove cause in fact.  ECF No. 73 at 20.  In

17   particular, they argue that Plaintiffs cannot establish what information would have

18   been obtained had Dr. Funabiki received a formal suicide assessment, and

19   therefore Plaintiffs "can only speculate as to what conclusion the mental health

20   professional would have reached following a formal assessment." *Id.* at 16-17, 20.

ORDER - 35

Defendants also argue that Plaintiffs cannot produce "evidence that suicide prevention protocols would have prevented [Dr. Funabiki] from completing his suicide." *Id.* at 17, 20.

Plaintiffs have produced sufficient evidence from which a reasonable jury could find a causal connection between the County's alleged negligence and Dr. Funabiki's death.[9]  Dr. Perrien opines that the Jail's policies did not meet the relevant standard of care, which "requires that known objective risk factors (e.g., age, offense, first-time offender, sexual offense charge) be considered during the screening process so that new arrivals who are at risk can be kept safe and promptly and thoroughly evaluated by a QMHP."  ECF No. 96 at 14.  The Court finds that reasonable minds could differ about the cause in fact of Dr. Funabiki's suicide.  *See Joyce*, 119 P.3d at 833.

The Court denies summary judgment for the County on the negligence claim.

**D. Supplemental Jurisdiction**

---

[9] In contrast, evidence of negligence is insufficient to establish deliberate indifference for a Section 1983 claim.  *Est. of Rogers ex rel. Rogers v. NaphCare, Inc.*, No. 20-CV-467, 2023 WL 2763116, at *4 (E.D. Wash. Apr. 3, 2023).

Plaintiffs invoked federal question jurisdiction under 28 U.S.C. § 1331 based on their federal Section 1983 claims, with supplemental jurisdiction under 28 U.S.C. § 1367 for their state-law negligence claim. ECF No. 35 at 3-4. Now, only the state law claim remains.

A district court "may decline to exercise supplemental jurisdiction over a claim" where it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). When determining whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (citation and quotation marks omitted).

Given how long this case has been pending in federal court; the Court's overall familiarity with the case; the Court's previous *Daubert* rulings; the fact that witness lists, trial exhibits, and motions in limine have already been filed in preparation for trial; and the upcoming November 2024 trial date; the Court finds that judicial economy, convenience, and fairness weigh in favor of continuing to exercise supplemental jurisdiction over this claim. However, any party that desires to be heard on the matter of the Court continuing to exercise supplemental

jurisdiction over the negligence claim may file a brief in accordance with the schedule below.

## CONCLUSION

The Court grants summary judgment for Defendants Keller, Scharf, Myers, and Anderson on all Section 1983 claims and dismisses them from this matter, as there are no further claims pending against them.  The Court grants summary judgment for the County on the Section 1983/*Monell* claim but denies summary judgment for the County on the negligence claim.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Defendants' Motion for Summary Judgment, **ECF No. 73**, is **GRANTED in part** and **DENIED in part** in the manner explained above.

2.    If any party wishes to be heard on the Court's continued exercise of supplemental jurisdiction, that party shall file a brief, consisting of no more than 5 pages, within 7 days of this Order.

**IT IS SO ORDERED.**  The District Court Executive is directed to (1) enter this Order; (2) provide copies to the parties; **(3) enter judgment for Defendants Scharff, Keller, Anderson, Myers, and Whitman County on all of Plaintiffs' Section 1983 claims; and (4) TERMINATE Defendants Scharff, Keller, Anderson, and Myers from this matter.**

DATED October 5, 2024.

ORDER - 38

_s/Mary K. Dimke_
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE